## A02A0287. CREED v. THE STATE.
(565 SE2d 480)

MIKELL, Judge.

Buford Lee Creed was convicted of one count of aggravated child molestation and three counts of child molestation for sexually abusing his niece. The court sentenced him to ten years confinement. Creed appeals the court's denial of his motion for new trial, arguing that he was denied a competent jury and the effective assistance of counsel, that the court did not follow proper procedure in polling the jury, and that the trial judge improperly expressed an opinion on the case. We disagree and affirm the conviction.

Viewed in the light most favorable to the jury's verdict, the record shows that Creed's abuse of his niece, J. W., began when the victim was nine years old and continued until she was fourteen, when she reported the abuse to her parents. The evidence further shows that J. W. spent a significant amount of time with her uncle over the years. J. W. testified that when she was nine, Creed began the practice of putting his hand under her shirt and rubbing her chest and that this behavior went on for approximately one year. According to J. W., Creed resumed touching her when she was in the seventh grade. J. W. testified that Creed put his hands inside her shirt and fondled her chest on numerous occasions in his truck, in his home, and in her parents' home. Creed often kissed the victim, putting his tongue inside her mouth. J. W. testified that she would normally just "sit there" when Creed touched and kissed her, because she was afraid of him. J. W.'s testimony revealed that Creed began purchasing alcohol and cigarettes for her and her friends, and that he would often touch her on nights that he bought her alcohol.

Creed's molestation of J. W. progressed when the victim was in the eighth grade. Once when J. W. was staying at Creed's home, he came into her bedroom, removed her pants and panties, and licked her "private parts." J. W. testified that on another occasion when she was riding with Creed in his truck, Creed pulled over, kissed her, removed her pants and undergarments, and "licked [her] private parts." J. W. described other incidents in which Creed penetrated her by putting his fingers inside her "private parts." She estimated that he penetrated her with his fingers on between six and eight occasions and testified that the incidents normally occurred in his truck. According to J. W., she did not report Creed's behavior to her parents because she loved her uncle and did not want him to get into trouble.

The record also reveals that J. W. told three friends about the abuse. According to K. B., a close friend of J. W., J. W. asked her to keep the abuse a secret and occasionally begged K. B. to spend the night at Creed's home with her so that J. W. would not be alone with her uncle. Another friend, H. U., testified that during the summer after the girls were in the eighth grade, J. W. told H. U. that Creed "molested her, that he went down her pants and up her shirt and kissed her." Additionally, B. M., J. W.'s former boyfriend, testified that J. W. told him on several occasions that Creed "felt on her breasts and went down her pants and felt on her private area and stuff." The record shows that B. M. attempted to convince J. W. to report the abuse, but she insisted that it be kept a secret. B. M. further testified that he and J. W. did not engage in sexual intercourse and that he never touched her private area.

J. W.'s parents discovered Creed's sexual abuse of their daughter in September 1999. The evidence shows that when J. W. was in the ninth grade, she and her friends had a "pool party" at Creed's home while he and his wife were out of town. Creed's wife became upset because the children left trash on the premises, and she contacted K. B.'s mother to complain. K. B.'s mother testified that she confronted her daughter and that K. B. responded that "there's a lot of things that goes [sic] on over there that you're not aware of that I need to talk to you about." K. B. then informed her mother of Creed's sexual abuse of J. W. K. B.'s mother told her daughter that if J. W. did not report the abuse to her parents, then she would. J. W. told her mother about Creed's actions the next day. J. W.'s parents contacted the authorities, who conducted an investigation and ultimately arrested Creed.

Dr. Suzanne Schuessler, a pediatrician who examined J. W. immediately after the abuse was reported, testified that J. W. exhibited physical signs of sexual abuse. According to Dr. Schuessler, she performed a pelvic examination on J. W. which revealed a tear in the opening of the vagina "at the five o'clock position" and a fleshy mass that was possibly scar tissue. The doctor testified that a tear in that position was significant because it was usually caused by vaginal penetration by someone other than the victim. Dr. Schuessler further testified that J. W. explained that Creed touched her and that he "was sticking his finger in [her]." When asked by the doctor, J. W. denied having any prior sexual activity with boyfriends or male acquaintances other than Creed. Dr. Schuessler confirmed that J. W.'s description of the abuse was consistent with her physical findings.

1. First, Creed argues that the trial court erroneously commented on the evidence and expressed its opinion in violation of OCGA § 17-8-57. Specifically, Creed contends that the court expressed an opinion in

the course of an exchange with defense counsel. During the defendant's cross-examination of J. W., the state objected three times to the relevance of a line of questioning concerning the pool party J. W. and her friends had at Creed's home. The court gave the defense some latitude and expressly overruled the first two objections. Eventually, after the state's third objection, the trial judge urged defense counsel to move on:

> THE COURT: Mr. Thomas, where are you going with all of this? You've just been going over and over this same thing.
> MR. THOMAS: I'm going to get to the truth, Your Honor.
> THE COURT: About what? About a pool party? There are no charges related to a pool party, Mr. Thomas. Move on if you would and try to get to something that's relevant to the case.
> MR. THOMAS: Your Honor, Ms. Kirby [the prosecutor] says that this lady's telling the truth. I want to find out if she is honest or not. And to do that, I have to ask questions, and that's what I'm doing is asking questions.
> THE COURT: I have overruled three relevancy objections, and we are still on the same subject. Now, I don't mind giving you a lot of latitude; you've got a client who's charged with very serious offenses, and I want to give you all the latitude I can give you, but you just keep asking the same questions over and over about the same subject matter. Let's try to move on.

Contrary to Creed's argument, we conclude that the colloquy between the trial judge and defense counsel did not constitute a violation of OCGA § 17-8-57. Under that statute, it is error for a judge to "express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused."

Unlike the judge in *Paul v. State*, 272 Ga. 845, 846 (1) (537 SE2d 58) (2000), who "intimated his opinion as to the credibility of witnesses and the guilt of the defendant," the trial judge in this case did not comment on the evidence or the guilt of the defendant. Instead, the court inquired as to the direction defense counsel was going with a particular line of questioning and encouraged counsel to move forward. There is no indication in the record that the court expressed an opinion as to the sufficiency of the evidence or the guilt of the defendant.

Furthermore, in *Rowe v. State*, 266 Ga. 136, 139 (2) (464 SE2d 811) (1996), the Supreme Court expressly stated that "the rule which prohibits an expression or intimation of opinion by the trial court as to what has or has not been proved, OCGA § 17-8-57, does not generally extend to colloquies between the judge and counsel regarding the

admissibility of evidence." (Citations and punctuation omitted.) In addition, it is well settled that "[r]emarks of a judge assigning a reason for his ruling are neither an expression of opinion nor a comment on the evidence." (Citations and punctuation omitted.) *Johnson v. State*, 234 Ga. App. 58, 59 (1) (506 SE2d 212) (1998). See also *Cammon v. State*, 269 Ga. 470, 475 (9) (500 SE2d 329) (1998); *Waldrip v. State*, 267 Ga. 739, 751 (20) (482 SE2d 299) (1997); *Dickerson v. State*, 241 Ga. App. 593, 595-596 (3) (526 SE2d 443) (1999).

Finally, at the close of the trial, the judge charged the jury as follows:

> [B]y no ruling or comment which I may have made during the course of this trial have I intended to express any opinion whatsoever about the facts of the case, the credibility of any witness, or the guilt or innocence of this Defendant, as these are solely matters in your province to decide. My only interest in the case has been to see that it be tried fairly and in accordance with the law, and that you be enabled, insofar as humanly possible, to arrive at a verdict which speaks the truth and which does justice under the law.

Accordingly, we find no error. See *Hunt v. State*, 247 Ga. App. 464, 469 (5) (542 SE2d 591) (2000).

2. Next, in two related errors, Creed argues that the court erred in failing to follow the proper procedure for polling the jury and in denying his motion for a new trial, because the Troup County Board of Jury Commissioners failed to "compile, maintain, and revise a trial jury list of upright and intelligent citizens of the County to serve as trial jurors" as required by OCGA § 15-12-40 (a) (1). Specifically, Creed contends that juror Ruby Rosser was incompetent to serve because she did not meet the intelligence requirement of the statute. See *Sullivan v. State*, 225 Ga. 301, 304-305 (4) (168 SE2d 133) (1969), vacated on other grounds, 229 Ga. 731 (194 SE2d 410) (1972). We disagree and affirm.

(a) First, the transcript reveals that the trial court polled the jury after publishing the verdict. When the judge questioned Rosser, the following exchange took place:

> THE COURT: Ms. Rosser, was that your verdict in the jury — Well, did you hear the verdict as I read it?
> MS. ROSSER: Yes, sir. (Brief pause.)
> THE COURT: Ms. Rosser, are you okay? (Brief pause.) Well, let me just let Ms. Rosser be there for a minute. I'll go with other jurors if I could.

After polling the other members of the jury, who expressed their agreement with the published verdict, the trial judge returned to Rosser.

> THE COURT: Ms. Rosser, I'm going to need to get you to respond one way or another to these questions. You've already indicated that you heard the verdict as I read it. Was that your verdict in the jury room? (Brief pause.)
> MS. ROSSER: My daddy's gone.

At that time, the court asked the jury to return to the jury room so that Rosser could compose herself. The defense moved for a mistrial, and the court denied the motion. When the jurors returned a few minutes later, the court proceeded as follows:

> THE COURT: Let me ask if any of you that I polled earlier would now have a different response to any of the questions I asked about whether the verdict, as I read it, was your verdict, whether it was freely and voluntarily made, and whether it's still your verdict. Would any juror have a different response than you responded earlier, and, if so, raise your hand.

None of the jurors raised their hand. Next, the court addressed Rosser.

> THE COURT: And now, we are down to Ms. Rosser, and I need to ask you, Ms. Rosser. You indicated that you heard the verdict as I read it. Was that your verdict in the jury room?
> MS. ROSSER: Yes, sir.
> THE COURT: Is it still your verdict?
> MS. ROSSER: Yes, sir.

Creed argues that the court erred by not rejecting the verdict and ordering the jury to deliberate further after Rosser's initial response. He relies on *Walker v. State*, 159 Ga. App. 50 (282 SE2d 697) (1981), in which this Court held that when a juror announced that he was "not sure" that the published verdict was his verdict, the trial court should not receive the verdict, and the jury should retire for further deliberation.

We find no error. Unlike in *Walker*, supra, in the case sub judice, Rosser did not indicate that the verdict was not unanimous. Rather, she initially failed to respond to the court's question at all. After given a chance to compose herself, Rosser expressly stated that the published verdict was her verdict in the jury room and that it was

still her verdict. Furthermore, the court inquired of the jury if anyone had a different response to the questions asked when they were polled.

(b) We also find no error in the court's denial of Creed's motion for new trial based on his argument that Rosser was incompetent to serve on the jury. At the hearing on his motion for new trial, Creed called juror John Stone to testify about Rosser's behavior during the trial and subsequent jury deliberations. Stone testified that in his opinion, Rosser was "kind of a radical person," and that she seemed worried on occasion and mumbled things that he could not understand. He further testified that Rosser became emotional and cried on approximately three occasions during their jury service. In addition to describing her emotional behavior, however, Stone testified that he believed that Rosser understood the facts of the case.

The state submitted the affidavits of four jurors, including the foreperson, who swore that the verdict was unanimous, that Rosser appeared to be mentally competent and participated in the deliberations, and that she freely arrived at her verdict. The affidavits were offered pursuant to OCGA § 17-9-41, which provides that affidavits of jurors "may be taken to sustain but not to impeach their verdict." After hearing the testimony and reviewing the affidavits, the trial court determined that Rosser had been competent to serve on the jury and denied the motion for new trial.

Based on the record, we conclude that the trial court did not err in denying the motion on this ground. In *Sullivan*, supra, 225 Ga. at 305 (4), the Supreme Court recognized that "[a]n intelligent person is one possessed of ordinary information and reasoning faculty. No particular degree of intelligence is required by this statute." Creed has failed to demonstrate that Rosser was not an intelligent juror as contemplated by OCGA § 15-12-40 (a) (1).

3. Finally, Creed argues that the trial court erred in denying his motion for new trial because he was denied effective assistance of counsel. He raises a number of alleged deficiencies in his trial counsel's performance. "To establish ineffectiveness, a defendant must prove that his trial counsel's performance was deficient and the deficiency prejudiced his defense to the extent that there was a reasonable probability the result of the trial would have been different but for defense counsel's unprofessional deficiencies." *Hardegree v. State*, 230 Ga. App. 111, 113 (4) (495 SE2d 347) (1998). "A trial court's finding that a defendant has been afforded effective assistance of counsel must be upheld unless clearly erroneous." (Citations and punctuation omitted.) *Williams v. State*, 234 Ga. App. 191, 193 (2) (506 SE2d 237) (1998). Bearing these principles in mind, we find no merit to Creed's claims.

(a) Creed has provided a list of 78 objections he believes his trial counsel failed to raise at trial, most of which are objections to leading questions. However, Creed failed to offer any evidence or argument to demonstrate how he was prejudiced by his counsel not objecting in those instances. "Absent a showing of prejudice, inquiry into counsel's alleged deficiency is unnecessary." *Hardegree*, supra at 113 (4). See also *Silcox v. State*, 241 Ga. App. 845, 846 (c) (528 SE2d 271) (2000).

Furthermore, it is quite possible that Creed's trial counsel elected not to object to the form of the state's questions as a matter of strategy. "There is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy." (Punctuation omitted.) *Williams*, supra. "Counsel's decisions on matters of tactic and strategy, even if unwise, do not amount to ineffective assistance of counsel." *Scott v. State*, 238 Ga. App. 258, 260 (2) (518 SE2d 468) (1999). See also *Aleman v. State*, 227 Ga. App. 607, 612 (3) (489 SE2d 867) (1997). Thus, we reject Creed's claim of ineffective assistance of counsel on this ground.

(b) Creed contends his counsel was deficient for not objecting to the court's allegedly improper expression of its opinion of the case. We held in Division 1 that the court did not err in explaining its ruling on the state's relevancy objection. Therefore, any objection to the court's explanation would have been overruled, and Creed cannot show prejudice. See *Hardegree*, supra at 113 (4).

(c) Next, Creed contends that his counsel was deficient for "fail[ing] to raise the issue of the state's non-compliance with the discovery statute." Creed does not elaborate on how the state failed to comply, nor does he explain how he was prejudiced by this alleged noncompliance. Therefore, this argument presents nothing for our review. Court of Appeals Rule 27 (c) (2).

(d) Creed argues that his counsel rendered ineffective assistance by failing to impeach the victim with prior inconsistent statements. This argument has no merit, because Creed has failed to produce any evidence of such alleged inconsistent statements. See *Lewis v. State*, 249 Ga. App. 812, 816 (5) (c) (549 SE2d 732) (2001).

(e) Finally, Creed contends that his counsel failed to communicate with him concerning plea negotiations. Both of Creed's lawyers testified at the hearing on his motion for new trial that they discussed all of the state's plea offers with Creed and that he was not interested in accepting them. Creed failed to rebut this testimony. Accordingly, we find no error.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED APRIL 17, 2002 —
RECONSIDERATION DENIED MAY 20, 2002.

*Kenneth L. Gordon, Franklin H. Thornton*, for appellant.
*Peter J. Skandalakis, District Attorney, Nigel R. Lush, Assistant District Attorney*, for appellee.